**UNITED STATES of America, Appellee,**

v.

**Eddie CAULEY, Appellant.**

**No. 343, Docket 82–1142.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 16, 1982.

Decided Jan. 5, 1983.

Certiorari Denied Feb. 22, 1983.
See 103 S.Ct. 1230.

Peter Chavkin, Brooklyn, N.Y., Asst. U.S. Atty., E.D.N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., Jane Simkin Smith, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Lawrence Stern, New York City, for appellant.

Before FEINBERG, Chief Judge, OAKES, Circuit Judge, and BONSAL,[*] District Judge.

FEINBERG, Chief Judge:

Appellant Eddie Cauley was convicted after a jury trial in the United States District Court for the Eastern District of New York before Judge I. Leo Glasser of violating 18 U.S.C. § 111 by assaulting or interfering with Gloria Morales, a mail carrier for the United States Postal Service, while she was delivering the mail. Cauley is presently serving his sentence of three years in prison. On appeal, he argues that the trial judge erred in permitting the prosecutor to cross-examine Cauley about his prior fights, in instructing the jury on the specific intent required by the statute and on the burden of proof, and in denying Cauley's mid-trial request to discharge his attorney and represent himself. We find that Judge Glasser committed no reversible error, and affirm the conviction.

## I. Background

Three witnesses testified at trial: Morales, the complaining witness, defendant Cauley, and James Burton, a postal inspector who interviewed Morales shortly after the incident. Also introduced into evidence were the handwritten, signed statement given by Morales to Burton and, by stipulation, the record of Morales's visit to the Smithtown General Hospital two days after the incident, along with an explanation by the treating physician of the hospital record. There is no dispute that the evidence showed that Cauley and Morales came to blows while Morales was delivering the mail, with the result that Morales was bruised about the face. The only real question before the jury was who provoked the fight.

Morales testified substantially as follows: On October 17, 1981, while she was delivering the mail to Route 19 in Brooklyn, Cauley, whom she had never seen before, called out to her to ask whether she had an unemployment check that he was expecting. It is not uncommon at that time of the month for people in that area to stop mail carriers to inquire about government checks. Morales responded, as was her habit, by asking Cauley's address and telling him when she expected to reach it. After some conversation, she started to continue her rounds, but Cauley restrained her mail cart. She asked him to let go, but he did not, and when she tried to move his hand off the handle of the cart, he hit her face several times with his closed fist. When her feeble attempt to hit back was unsuccessful, she left the cart to telephone the postal inspectors, and Cauley retreated.

Shortly thereafter, Cauley was arrested in his sister's apartment, where he was temporarily residing. Although Morales's and Burton's testimony indicates that Morales was shaken and bruised, she did not seek

---

[*] Senior United States District Judge for the Southern District of New York, sitting by designation.

medical attention until two days later, because she hates hospitals. The record of her visit to the emergency room of Smithtown General Hospital on October 19 shows that her nose was bruised.

Defense counsel tried to impeach Morales's testimony by suggesting that the hospital record showed that she was exaggerating the extent of her injuries, and that her failure to include certain details in her initial statement to Burton implies that she fabricated them. The defense also tried to establish a motive for Morales to lie by eliciting testimony that she had previously been formally reprimanded for carelessly slipping on ice. This was supposed to have made her fear that any further infractions would jeopardize her job. But the principal defense tactic was Cauley's own testimony that Morales hit him first. He stated that he restrained her cart because he wanted to ask her another question, because "she was being disrespectful and cute and trying to pull off," and because she was about to step into traffic. According to Cauley: She responded by stabbing him with her pen and hitting him with both her fists. He had time only to take one step back and throw up his hands, and in so doing he accidentally hit her face. Cauley added, on direct examination: "If I intended to assault this woman, I could have continued and pressed the issue and beat her to death. Well, you know, beat her up, if that was my intention." He further volunteered on cross-examination: "Might I add that, you know, I would have been justified in beating up Miss Morales. I am quite capable of doing so." Thus, Cauley's defense raised one critical issue—what his intent was in hitting Morales—and depended for success on whom the jury chose to believe. By its guilty verdict, the jury indicated its choice.

## II. Evidence of Prior Fights

■ The contention that the trial judge improperly admitted evidence of defendant's prior involvement in fights is obviously a serious one in an assault case in which the defendant's credibility is the key issue. "[E]vidence of a violent disposition to prove that the person was the aggressor in an affray" is not generally admissible. Fed.R. Evid. 404(a) advisory committee note. However, as the note goes on to explain, subdivision (b) of Rule 404

> deals with a specialized but important application of the general rule excluding circumstantial use of character evidence. Consistently with that rule, evidence of other crimes, wrongs, or acts is not admissible to prove character as a basis for suggesting the inference that conduct on a particular occasion was in conformity with it. However, the evidence may be offered for another purpose ... which does not fall within the prohibition,

including "proof of ... intent." Fed.R. Evid. 404(b). When the prosecutor proposed to introduce in rebuttal to Cauley's testimony evidence that Cauley had been convicted of assault three times in the previous three years, Judge Glasser ruled that the probative value of the convictions was outweighed by the danger of prejudice they posed, and therefore excluded them under Fed.R.Evid. 403. But he granted the prosecution's alternative request for permission to cross-examine Cauley about the fights that led to the convictions, in order to elicit evidence bearing on Cauley's professed innocent intent in hitting Morales.

This ruling is certainly problematical. There is no question that Cauley placed his intent squarely in issue. Cf. *United States v. Manafzadeh*, 592 F.2d 81, 86–87 (2d Cir. 1979) (evidence of subsequent similar acts, though relevant to intent, inadmissible because intent not at issue); *United States v. O'Connor*, 580 F.2d 38 (2d Cir.1978) (evidence of prior similar acts improperly admitted where intent not at issue). Cauley's attorney stated in a pre-trial discussion of the Rule 404(b) evidence that "[w]e are in agreement that intent is the issue here." Cauley himself made it clear on direct examination that his defense was that "[i]t was not my intention to beat her up or to hit her at all or to hold—take the mail cart or anything of that nature." We have found that where the issue is whether or not defendant participated in the planning of a bank robbery with the serious intent to

go through with it, evidence of his prior involvement with bank robberies is admissible. *United States v. Williams,* 577 F.2d 188 (2d Cir.), cert. denied, 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978). See also *United States v. Cavallero,* 553 F.2d 300 (2d Cir.1977) (evidence of subsequent kidnapping of another victim admissible as probative of intent to kidnap, as well as of common plan or design). Other courts, too, have found that other criminal acts are admissible as probative of intent, when intent is an issue in the case. See *United States v. Beechum,* 582 F.2d 898, 909–18 (5th Cir.1978) (en banc) (where defense is that defendant mailman intended to turn in money taken from the mail, court properly admitted evidence that he had in his possession credit cards stolen from the mail months earlier), cert. denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979); *United States v. Hearst,* 563 F.2d 1331, 1335–37 (9th Cir.1977) (evidence of subsequent participation in robbery admissible to rebut defense of duress to bank robbery charge), cert. denied, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978). But defendant would have us distinguish between the intent that one forms to commit planned crimes like bank robbery, *United States v. Williams,* supra, or bribery, cf. *United States v. Benedetto,* 571 F.2d 1246 (2d Cir.1978), and the split-second decision to commit an assault. The Ninth and Fifth Circuits appear to make such a distinction. See *United States v. Bettencourt,* 614 F.2d 214, 217 & n. 6 (9th Cir.1980); *United States v. San Martin,* 505 F.2d 918, 923 (5th Cir.1974). The argument against Judge Glasser's ruling, then, is that the intent to assault that was at issue in this case is not the kind of "intent" referred to in Rule 404(b).[1]

We regard this as a difficult issue, but the facts of this case do not require us to decide it. Whether or not we believe that prior involvement in fights is in this case or ever could be probative of intent to assault within the meaning of Rule 404(b), we conclude on the record as a whole that Cauley was not prejudiced by the government's cross-examination.

The relevant portion of the trial transcript is set out in the margin.[2] The only

---

1. The Government points out that at trial "defense counsel apparently acknowledged the probative value of prior aggression on the issue of intent" by repeatedly asking Morales on cross-examination about her "past propensity for mistreating individuals on her mail route." As indicated below, we need not decide whether considerations of fairness justified allowing government counsel the same latitude on cross-examination. Cf. *United States v. Jackson,* 405 F.Supp. 938, 943 (E.D.N.Y.1975).

2. The following occurred during the prosecutor's cross-examination of Cauley:

Q  Have you ever been in a fight before, Mr. Cauley?
A  Yes.
Q  How many times?
MR. PASTER: Objection.
THE COURT: Overruled.
A  I can't count.
Q  Well, put a round number on it, Mr. Cauley.
More than ten?
MR. PASTER: Objection.
THE COURT: Overruled.
A  I would say—you mean in my life?
Q  Sure.
A  Yes.
MR. PASTER: Your Honor, if Mr. Chavkin is going to continue in this way will the Court note a continuing objection to this line of questions?
THE COURT: Yes.
Q  So you say about ten or more?
A  Probably more.
Might I add that, you know, I would have been justified in beating up Miss Morales. I am quite capable of doing so.
Q  I am sorry, you would have been justified by beating her up?
A  Yes, by her actions.
Q  What was the most recent fight before this one with Miss Morales, the one before that?
When was the last one before that?
A  I don't understand why this is relevant or important.
THE COURT: Please answer the question, Mr. Cauley.
A  I don't recall.
MR. CHAVKIN: May I approach the witness, your Honor?

. . . . .

Q  (Handing document) Mr. Cauley, I show you what has been marked for identification as Government's Exhibit number 6. Take a moment to read that over and see if your recollection is refreshed.
A  (Perusing document) I know what this is.

information elicited by this cross-examination was that Cauley had been involved in more than ten fights in his lifetime; that he at first could not recall the one that immediately preceded his entanglement with Morales; and that a glance at Government's Exhibit No. 6—an arrest report not shown or identified to the jury—refreshed his memory. Cauley then refused to discuss the prior fights any further. When this piece of testimony is compared to the accumulation of evidence whose admissibility is conceded, it becomes clear that Judge Glasser's decision to permit cross-examination on the prior fights was harmless, even if we assume arguendo that it was error.

Cauley's explanation of what happened was highly improbable. It is hard to believe that a female letter carrier, 5′5″ in height and working a route in a depressed neighborhood of Brooklyn, would provoke a fight with a strange man six feet tall. She could not have hoped to force him to let go of her cart by force or intimidation. Even more incredible is Cauley's contention that Morales's attack was so swift and effective that he was unable to avoid it by retreating, but was startled into throwing his hands up into her face with sufficient force to leave a bruise that lasted several days. Cauley himself admitted that he was not afraid of Morales, and was "fully capable" of beating her up. Moreover, he made a number of statements at the trial and to the police on October 17, 1982 that belied his allegedly benign intentions in restraining Morales's cart.[3] The contention that Cauley was afraid Morales would step into traffic was clearly fabricated after the fact. Thus, Cauley's version of the incident is implausible even on paper.

But even if all of this, combined with the testimony of Morales, were not enough to convince the jury of Cauley's guilt, Cauley himself provided the jury with far stronger evidence than the mere admission that he had been in more than ten other fights. Even from the transcript, it is easy to see that Cauley's behavior in court was that of an easily angered man. He described his own demeanor on the stand as "really bit-

---

But, your Honor, I thought we had a hearing on it regarding the admission of evidence such as this; am I not correct?

THE COURT: Well, I have not heard any question, assuming that you would not enter such question.

I do not know what the next question is.

(The following discussion held at side bar)

MR. CHAVKIN: This is an arrest report, your Honor, as to a fight in which he was convicted. I will not ask him whether he was arrested for it. I will ask him whether his recollection is refreshed about the fight.

.    .    .    .    .

[The court and counsel discussed the permissible scope of cross-examination.]

THE COURT: Continue with your line of inquiry, if that is what you want to do.

(End of discussion held at side bar)

Q  Mr. Cauley, does Exhibit number 6 refresh your recollection?

A  Yes.

Would you tell me—apparently are we going back on the established the denial of the admission of the evidence?

THE COURT: I have not made any ruling with respect to that.

THE WITNESS: I am sure you have and I am sure the record will show that you ruled on the question of—

MR. PASTER: (Interjecting) I will object at this time on the question.

THE COURT: Your objection is overruled.

Q  Mr. Cauley, do you recall the circumstances of that fight?

A  Yes.

Q  And would you tell the jury what happened in that fight?

A  Well, I am—I refuse to answer any questions regarding this because—because of the denial of such evidence by Mr. Glasser to admit such evidence into the trial.

Q  Let me ask one last question.

In that fight were you provoked?

A  I don't care to even discuss it.

Q  One last question, if you will permit me—

A  (Interjecting) On grounds that I mentioned to take the fifth.

**3.**  For instance, Cauley testified on cross examination:

I started to ask her another question and she said, "Well, I have to go," and she turned to walk away. She was pulling the cart at the time. By my leaning on the cart, it appeared to be done purposely, to disrespect me.

He also acknowledged having said in his sworn statement to the police on the day of the incident:

She was abrupt and it was disrespectful. I would have been off balance. I didn't like the idea of her abruptly ignoring me. I held the cart for a minute.

ing my tongue and gritting my teeth in sitting here and going through all this because of something this woman perpetrated against me ...." He interrupted the cross-examination of Morales with shouted obscenities and the demand that he be allowed to dismiss his lawyer and represent himself, and refused to obey the judge's request that he be seated. His gratuitous remark to the prosecutor that he "would have been justified in beating up Miss Morales" has already been quoted. The few minutes of cross-examination spent on the prior fights were devoted mainly to Cauley's boisterous refusals to answer questions and his disputations over the evidentiary ruling. He even argued with the judge about what the 404(b) ruling had held. This demeanor evidence, when combined with the testimony and documents described above, convinces us that Judge Glasser was right in concluding that the proof of Cauley's guilt was "overwhelming." Even if the prior fights had never been briefly mentioned, there is no reasonable possibility that the jury would have found Cauley not guilty.

### III. Other Contentions

Cauley's other contentions on appeal can be disposed of quickly. The jury charges were correct. The only objection to the instruction on intent and interference adequately raised below is easily refuted by comparing the charge given to the one requested by Cauley: they are almost identical. The instruction on reasonable doubt, read as a whole, is not misleading. The instruction requested by Cauley—that "a preponderance is not enough"—would have been an appropriate addition, but it was not necessary. Finally, Judge Glasser's refusal to allow Cauley to dismiss his Legal Aid lawyer in the middle of the cross-examination of the prosecutor's witness and to proceed pro se was entirely proper in the circumstances. The right to self-representation is "sharply curtailed" once trial with counsel has begun. *United States ex rel. Maldonado v. Denno,* 348 F.2d 12, 15 (2d Cir.1965), cert. denied, 384 U.S. 1007, 86 S.Ct. 1950, 16 L.Ed.2d 1020 (1966). Both during and after trial, the judge advanced

persuasive evidence of counsel's competence, and the record is replete with support for the conclusion that Cauley's behavior posed a "potential for disruption and bedlam" if he were permitted to represent himself. Thus, Judge Glasser was clearly correct in determining, according to the test of *Maldonado,* that "the potential disruption of the proceedings already in progress was great and the prejudice to the legitimate interests of the defendant was nil."

The judgment of conviction is affirmed.